**IN THE COURT OF APPEALS OF IOWA**

No. 16-2120
Filed September 13, 2017


**IN RE THE MARRIAGE OF ANGELA MAY THOMAS**
**AND STEVEN RAY THOMAS**

**Upon the Petition of**
**ANGELA MAY THOMAS,**
        Petitioner-Appellee,

**And Concerning**
**STEVEN RAY THOMAS,**
        Respondent-Appellant.
_____


        Appeal from the Iowa District Court for Jasper County, Randy V. Hefner,

Judge.


        The husband appeals from the economic provisions of the parties'

dissolution decree.  **AFFIRMED.**


        Barry S. Kaplan and C. Aron Vaughn of Kaplan & Frese, L.L.P.,

Marshalltown, for appellant.

        Lucas W. Otto of Otto Law Office, P.L.L.C., Newton, for appellee.


        Considered by Danilson, C.J., and Potterfield and Bower, JJ.

**POTTERFIELD, Judge.**

Steven Thomas appeals from the economic provisions of the decree dissolving his marriage to Angela Thomas. In response, Angela asks us to affirm the district court's decree and award her $2500 in appellate attorney fees.

**I. Background Facts and Proceedings.**

Angela and Steven were married in May 2009, when they were approximately thirty-five and forty-four years old, respectively.

Steven has a high school degree and "some college." He has been unemployed at times during his adult life, but he has been employed generally in the construction industry. At the time the parties were married, Steven had been recently injured at a construction job; he was receiving $1400 each month in worker's compensation benefits as well as some unemployment benefits. After the parties married, Steven underwent surgery for his back injury; he has not returned to work since. He testified he remains in "considerable" pain and is able to work "only intermittently." In 2011, Steven received a lump sum settlement of $200,000 that was placed in the parties' joint account. By the time of the dissolution hearing—September 2016—the settlement funds had been exhausted. Steven testified he has no income and no way to support himself; he intended to apply for Social Security Disability but was advised to wait until after the dissolution proceedings were completed.

Angela works approximately twenty hours per week stocking shelves at a local grocery store and earns approximately $12,000 annually. Angela is in good health; however, she has a sixteen-year-old son (from a previous relationship) with severe physical and intellectual disabilities who requires around-the-clock

care. Angela was receiving approximately $745 per month in Social Security benefits on behalf of her son until sometime in 2014 or 2015, when Social Security informed Angela it was seeking approximately $25,000 from her for overpayment of benefits. While there is a dispute over whether Angela reported Steven's lump sum settlement to Social Security when he received it in 2011, it is undisputed the debt was caused by the receipt of the settlement funds. Once the debt is paid, Angela will begin receiving monthly benefits again, but she receives nothing while the outstanding debt remains. She testified she currently has no way to pay the debt.

Before the parties knew each other, Angela's parents bought the home next door to their own. They intended for Angela and her son to live there so they could help her when she needed them. The parents put $3000 down and financed $27,000 in the form of a mortgage. Angela was responsible for making the monthly mortgage payments. Additionally, before Angela moved in, Angela's parents spent approximately $15,000 on updates and repairs, including putting in a new furnace, replacing all of the windows, and fixing a water line. The home has been made accessible for Angela's son by adding a ramp and installing a shower into which his wheelchair can be rolled directly.

With part of the $200,000 settlement, Steven and Angela paid off the remaining mortgage on the home—approximately $21,500—and paid Angela's parents $5000. Steven estimated the parties spent another $50,000 in additional repairs and renovations to the home, including redoing the kitchen and a bathroom and adding insulation. In his pretrial report, Steven claimed he had

completed $50,000 worth of labor on the home. Nevertheless, at the time of trial, the home was worth $66,000.[1]

Additionally, the parties bought a second property, which they intended to "flip." They spent $16,500 purchasing the home in a foreclosure action and at the time of trial, the home was worth $34,000. Steven testified the home could not be sold without further work completed because in its current state, it did not qualify for a mortgage. Steven did not testify as to the amount of money spent on repairing the home,[2] but he claimed in his pretrial report that he had "put in hundreds of hours of sweat equity on [the] property." He believed the home needed $47,000 more in repairs and then it could be sold for approximately $130,000. Steven was living in the home at the time of the trial.

At trial, Steven asked the court to find the $25,000 debt owed to Social Security was not marital and order Angela to pay it. He also claimed he had $20,000 of tools that he had brought into the marriage that he believed should be returned to him without considering them to be marital property. Finally, he maintained the two homes should be sold, with money from the sale of the marital home being put toward further repairs in the second property. He testified that once the second property was sold and any proceeds were realized, he

---

[1] An appraisal completed on the home showed it had a value of $66,000, and the district court accepted this value. Steven testified with $4,000 more work completed, the property had a "maximum value they didn't figure would be more than 120[,000 dollars], but 110[,000 dollars] was not unrealistic." He also testified his adult daughter was willing to buy the home for $66,000.

[2] When asked, Steven testified at trial that he estimated "somewhere around 120, 130,000" dollars was used "towards the purchase and/or development of these two real estate properties." He did not have any supporting documentation, and it was unclear if he included any of his own labor in the estimate.

believed it was "not unreasonable" for him to be awarded 60% with Angela awarded 40%.

Angela asked the court to award her the marital home and award Steven the other property. She also stated she would accept the Social Security debt, but she asked the court to consider it as marital when dividing their assets.

The court dissolved the parties' marriage by decree on November 21, 2016. The court found the Social Security debt was marital, noting "the overpayment went into the family coffers and was spent for family purposes." Angela was awarded the marital home, the wheel-chair accessible van, and a 1984 pickup her father had originally owned. Steven was awarded the other property, a 1994 Honda Accord, as well as multiple four wheelers, and a ski boat. Steven admitted to selling one of the parties' other vehicles for $6000 during the pendency of the divorce; he kept those proceeds. Additionally, Steven was awarded "his tools, building materials, air compressor, engine, and white cupboard presently in Angela's possession."

Steven appeals.

## II. Standard of Review.

"In this equity action involving the dissolution of a marriage, our review is de novo." *In re Marriage of McDermott*, 827 N.W.2d 671, 676 (Iowa 2013). "Accordingly, we examine the entire record and adjudicate anew the issue of the property distribution." *Id.* We give weight to the district court's credibility determinations, but we are not bound by the court's findings. *Id.* "Although our review of the trial court's award is de novo, we accord the trial court considerable latitude is making this determination and will disturb the ruling only when there

has been a failure to do equity." *In re Marriage of Romanelli*, 570 N.W.2d 761, 763 (Iowa 1997).

## III. Discussion.

### A. Division of Marital Property.

Here, although the district court did not place specific values on all of the parties' property, it appears each party was awarded approximately the same net value of marital assets and debts. Steven claims this was in error. First, he maintains we should not consider the $25,000 Social Security debt as marital. Additionally, he maintains an equal split is not equitable in this case because of his poor health, lack of earning capacity, and the amount he contributed to the parties' assets through the use of the settlement funds and his labor.

First, we consider whether the Social Security debt should be considered marital. Steven suggests we consider *Edmonds v. Edmonds*, No. A-13-051, 2013 WL 5976336, at *3–4 (Neb. Ct. App. Nov. 12, 2013), in reaching our decision. In *Edmonds*, the court determined the Social Security debt was marital because the overpayment had been received by the family while the parties were still married and "both [husband] and [wife] benefitted from this overpayment as it was included in their marital income before their separation." 2013 WL 5976336, at *4. We reach the same conclusion here. It is undisputed the overpayment was received by Angela while the parties were still married—after Steven received the settlement in 2011 until Social Security realized the mistake sometime in 2014 or 2015. Even crediting Steven's claim that the Social Security benefits were placed in an account to which he did not have access, there has been no indication those funds were used for anything other than family

expenses. *See In re Marriage of Fennelly*, 737 N.W.2d 97, 105–06 (Iowa 2007) (determining debt that was incurred for the benefit of the family was marital in nature and should not be considered waste). As the district court did, we determine the debt should be included in the division of marital assets and debts.

Now, we consider whether the court's division was equitable. In doing so, we consider the factors enumerated in Iowa Code section 598.21(5) (2015). We also "remember marriage does not come with a ledger." *Id.* at 103. "Each person's total contributions to the marriage cannot be reduced to a dollar amount[, and] '[f]inancial matters . . . must not be emphasized over the other contributions made to a marriage in determining an equitable contribution.'" *Id.* at 104 (quoting *In re Marriage of Miller*, 553 N.W.2d 460, 464 (Iowa Ct. App. 1996)). Additionally, while Steven focuses on the money spent from "his" worker's compensation settlement and maintains he should be allowed to "recoup" as much as possible of what has been spent, "once received and retained during the marriage, the [workers' compensation] proceeds become property of the marriage." *In re Marriage of Schriner*, 695 N.W.2d 493, 498 (Iowa 2005). In other words, "the benefits become part of the divisible estate when received and retained during the marriage, just as other income becomes property when received and retained during the marriage." *Id.* "Settlement proceeds thus do not automatically belong to either party." *In re Marriage of McNerny*, 417 N.W.2d 205, 206 (Iowa 1987).

Although the marriage was of a short duration and does not necessarily require an equal division of assets and liabilities, the district court's decision to do so here was equitable. Angela received the more expensive home, but she also

agreed to be responsible for the entire $25,000 Social Security debt. Even more important, that was the home that was located next to Angela's mother, who was then able to help Angela with her son's care—as was intended even before Angela met Steven. Additionally, the other property was not wheelchair accessible, as Steven testified he removed the wheelchair ramp from the home.

While Steven argues the district court should have ordered both homes to be sold, we cannot fault the district court's decision to provide each party with a rent-free home instead. Neither party has a large earning capacity. The number of hours Angela can work is limited by the amount of care her son continues to need. And while Steven maintains he had zero earning capacity going forward, we do not believe that is necessarily the case. First, Steven stated he intended to apply for Social Security Disability benefits after the dissolution and he believed those benefits would be approximately $900 each month (which would place his income at nearly the same level as Angela's). Second, although there was testimony from Steven and his daughter that he was unable to work, Angela questioned whether that was actually the case, noting the number of hours of physical labor Steven had completed on their properties—a fact to which Steven also testified. Moreover, Steven testified he had a high school degree and "some college." It is possible he may return to work in a new, less physically demanding field.

We cannot say the district court "failed to do equity," and we will not disturb its ruling.[3]

_____

[3] We note part of Steven's argument the division of assets was inequitable rests on his claim Angela retained some of his tools. The district court ordered that all of his tools be

**B. Appellate Attorney Fees.**

Angela asks us to award her $2500 in appellate attorney fees. "Appellate attorney fees are not a matter of right, but rather rest in this court's discretion." *In re Marriage of Sullins*, 715 N.W.2d 242, 255 (Iowa 2006). "Factors to be considered in determining whether to award attorney fees include: 'the needs of the party seeking the award, the ability of the other party to pay, and the relative merits of the appeal.'" *Id.* (quoting *In re Marriage of Okland*, 699 N.W.2d 260, 270 (Iowa 2005)). Here, the record does not establish that Steven has the ability to pay Angela's attorney fees. We decline to award Angela appellate attorney fees.

We affirm.

**AFFIRMED.**

---

returned to him. If Angela retained his tools, there may be grounds for a contempt proceeding. It does not, however, make the district court's division inequitable.